In the Matter of the Appraisal for Taxation under the Act in Relation to Taxable Transfers, of the Property of the Estate of JAY GOULD.

JAMES A. ROBERTS, Comptroller of the State of New York, and ASHBEL P. FITCH, Comptroller of the City and County of New York, Appellants and Respondents; GEORGE J. GOULD and Others, as Executors and Trustees under the Will of JAY GOULD, Deceased, Respondents and Appellants.

*Transfer Tax Act — a residuary legatee may testify that his father gave him a legacy in payment for services — evidence showing that the legacy was not a gift — debts, expenses of administration and executors' commissions are to be deducted by an appraiser — method of appraising stocks of corporations.*

On an appraisal had under the Transfer Tax Act (Chap. 399, Laws of 1892), a residuary legatee and son of the decedent, called as a witness by the executors of his will, is not forbidden by any provision of section 829 of the Code of Civil Procedure from testifying to interviews had by him with the decedent tending to show that a particular legacy was given to him by the will in payment of a debt for services rendered by him to the decedent.

Where a father, having very large financial interests, in 1881, requests his son, then aged seventeen years, to devote himself wholly to the business of the father, no compensation for the services being then agreed upon or stated, and the son thereafter employs his entire time in his father's business, and until his death in 1892 alone conducts for his father during this period enormous transactions, and the father, shortly before his death, executes and delivers to the counsel who drew his will, for insertion therein as a codicil, a paper, sufficient in form to create a legal charge against his estate, which recites the nature of his son's services, fixes their value at $5,000,000, directs that they be paid in cash and certain securities, and provides that his son's receipt in full for the services mentioned shall be a sufficient voucher for the payment, and a codicil embodying the terms of the paper is subsequently prepared for and is executed by the father, the legacy given by the codicil is not to be deemed a mere gift

to the son and, therefore, taxable, but is to be regarded as the payment of a legal obligation of the father's estate.

In estimating the amount taxable under the Transfer Tax Act, the debts of the deceased, the expenses of administration and the commissions of the executors. are to be deducted.

An appraiser may properly determine, for the purposes of taxation, the value of stocks from reports of public sales of such securities made at the New York Stock Exchange, in compliance with chapter 34 of the Laws of 1891, and where no sales are made, he must ascertain the value from the best information which he can obtain.

The rule as to the adoption of Stock Exchange values is to be applied, although it appears that the decedent owned very large blocks of stock which, if thrown on the market at one time, might have a tendency to produce a break in it, and possibly result in the offer of a mere nominal price therefor.

INGRAHAM, J., dissented.

CROSS-APPEALS by George J. Gould and others, as executors and trustees under the will of Jay Gould, deceased, and by James A. Roberts, Comptroller of the State of New York, and Ashbel P. Fitch, comptroller of the city and county of New York, from an order of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 1st day of October, 1896, which affirmed an order theretofore made by said Surrogate's Court fixing the value of the property of the estate of Jay Gould, deceased, and the amount of the transfer tax thereon.

*John F. Dillon*, for the executors.

*John R. Dos Passos, David B. Hill* and *Edmund Francis Harding*, for the Comptrollers of the State of New York and of the city and county of New York.

WILLIAMS, J. :

Both parties appealed from the order. The Comptroller raised the question that the legacy to George J. Gould and the expenses of administration should not have been deducted in arriving at the value of the property for the purposes of taxation. The executors raised the question that there was an overvaluation of the property and that the amount allowed for the commissions of executors was too small.

The deduction of the amount of the legacy to George J. Gould

was made on the ground that such legacy was given in payment of an indebtedness owing by the estate, and was not, therefore, taxable under the statute. " There can be doubt, we think (as said ANDREWS, Ch. J., in *Matter of Westurn*, 152 N. Y. 100), that, in ascertaining the value of the estate of the decedent and the value of the taxable interests, debts owing by him are to be deducted. They are charges which qualify the estate, and are first to be paid before there can be any distribution of the personal estate to legatees or next of kin. The real estate is liable also to be sold for the payment of debts, when the personal estate is insufficient for that purpose. The tax imposed by the act is upon 'the transfer' of property by will or by the intestate laws of the State. (Act of 1895,* § 1.) Whether the transfer is by will or by operation of law, the real interest passing is what remains after payment of debts and other charges. It is plainly inferable from the sixth section of the act that the debts of the decedent are to be deducted in arriving at the valuation of the property and in fixing the tax. That section authorizes a proportionate amount of a tax to be refunded in case debts against the estate shall be proven after the tax shall have been paid. * * * The principle that, in administering the statute, debts, commissions and expenses of administration should be deducted in ascertaining taxable values, accords with the general practice and is permitted by a just construction of the law."

This proposition does not seem to be disputed by the Comptroller, but he insists that the legacy in question was not given in payment of any legal debt, but was a gift or gratuity from decedent, and liable as such to taxation. The question raised, therefore, is one of fact, and we are to inquire whether the appraiser properly determined that this legacy was given in payment of a debt owing by decedent at the time of his death. A part of the evidence given on this subject before the appraiser was that of the alleged creditor, George J. Gould, as to personal interviews between himself and the decedent, his alleged debtor, and it is claimed this evidence was improperly received under the Comptroller's objection, based upon section 829 of the Code of Civil Procedure. We do not think this objection was well taken. This was not a proceeding by the witness against the estate wherein he sought to establish his claim

---

* 1892.— [REP.

against the estate. It was a proceeding to ascertain the value of property of the estate for the purpose of taxation under the statute. The witness was, of course, interested in the event of this proceeding. He was not only a residuary legatee, and interested as such in the amount of the tax to be levied upon such residuary estate, but he was the legatee to whom this particular legacy was given, and if the legacy was taxable the tax would have to be paid by him or from the legacy itself. We fail to see, however, how it can be said that the witness was examined against the executors of the decedent, or any person deriving title or interest from, through or under the decedent, by assignment or otherwise. He was not examined as a witness against the executors, but in their favor. They claimed the legacy was a debt and not a gift or a gratuity. He was not examined as a witness against any one deriving title or interest from, through or under the decedent, because the tax was not upon the deceased's interest in the property, nor was it to be paid from such interest. It was a tax upon the interests of the legatees under the will, and was payable out of their respective interests as such legatees. The estate as an estate had no interest whatever in the amount of the tax. The legatees alone were the interested parties. (*In re Hoffman*, 143 N. Y. 327.) We think the witness was not incompetent under section 829 of the Code of Civil Procedure. Upon all the evidence before the appraiser bearing upon this question it seems to us the finding was properly made that this legacy was given in payment of a debt and not as a gift or gratuity. George J. Gould was born in 1864, and was about seventeen years of age at the time of the talk between him and his father at Saratoga in 1880 or 1881. The father then stated that he desired his son to devote himself entirely to his, the father's, business, to help him in his business wherever he could, to agree not to speculate or make any loans or do any other business on his own account, and George J. agreed to do as his father wished. From that time on until the father's death the son complied with this arrangement. He followed his father's directions during his minority, became familiar with the business, and did whatever his father directed. He came of age in 1885, and from that time on the work, care, burden and responsibility of the father's business and interests were thrown more or less upon the son, as the father's health

declined from year to year. The son had practically the sole charge and management of the whole business, and conducted it without the advice of the father. He alone had access to the safe deposit vaults which contained the millions of dollars of property owned by the father. He acted under a power of attorney from the father almost unlimited in its effect, was practically Gould himself, stood for him, and counsel were referred by the father to the son for instructions. During these years he had sole care and disposition of hundreds of millions of dollars of cash of the father, having as much as $30,000,000 at times, subject to his sole check, and the income from the estate so managed was from $3,000,000 to $4,000,000 annually. The estate at the death of the father amounted to about $78,000,000, and had been increased largely under the son's management, and the trust and confidence reposed by the father in the son had been amply justified by the results obtained. The estate was peculiar in its nature, and the large extent to which it was invested in different ways and different properties required great skill and capacity in the management, to secure favorable results. The capacity and business ability which safely and successfully managed such an estate, and the confidence which the father implicitly reposed in such management, were deserving of a large reward. From the time George J. came of age until the death of his father, the son received from the father gifts of securities from year to year, amounting in all to $284,657.50, and the son was made an officer in various corporations, and received salaries as such officer. He lived more or less of the time with his father, and had allowances from his father for expenses to some extent. There were talks between the father and son all along about the services rendered by the son in the business, but none of them were given in evidence, aside from the Saratoga interview, until the one occurring at the time of the purchase of the house and stable for the son, in October, 1892. The father then gave the son a check for $375,000, to pay for the house and stable and furnishing of the same, and said that he thought the son had worked very faithfully for him, and asked what he thought he should receive by way of compensation therefor, and if $500,000 per year would be satisfactory. The son said it would be. A little later, and on November 18, 1892, the father prepared in his own handwriting, and signed a paper wherein

he recited that his son had developed a remarkable business ability, had for twelve years devoted himself entirely to his father's business, and during the past five years had taken entire charge of all the father's different interests; and in this paper he fixed the value of his son's services at $5,000,000, payable in various items of cash and securities, therein specified (the items of cash to be less the amount advanced for the purchase of the house and stable), and he expressly provided that the son's receipt in full for the services mentioned should be all the voucher required. This paper the father delivered to his counsel, to be inserted in a codicil to his will. The will itself had been executed in December, 1885, about the time the son became of age, and one codicil had been added to it in February, 1889. He told his counsel when he delivered this paper to him that he had signed the paper to the end that if he should die without having made this provision a part of his will the paper would be binding upon him, and asked his counsel if it would not be so binding, and his counsel advised him that it would be. Another codicil was then prepared by counsel which contained, as its 8th clause, substantially the same provision as was put in this paper, and this codicil was executed November 21, 1892, three days after the paper was delivered to the counsel. A few days later, and about November 26, 1892, another interview occurred between the father and the son. The father was then sick in bed. He died a week later, December 2, 1892. At this interview the father told the son where the will was, and asked him to get it and read it, and the son did so. The father asked the son if he understood this 8th provision of the 2d codicil, to which the son replied that he did. The father asked the son if this provision was satisfactory to him, and the son replied that it was. This was the first knowledge the son had of this provision in the codicil, and he knew nothing of the paper containing a like provision until after the father's death. The will and codicils were admitted to probate after the decedent's death, and have never been questioned by any one interested in the estate. There is no claim made now that in making this paper and this codicil there was any design on the part of the decedent or George J. Gould to avoid the taxation of the amount of this legacy under the statute in question.

The actual value of the cash and securities specified in the paper

and codicil, over and above the $375,000 for the house and stable and house furnishing, was only about $3,500,000. We are unable to see how the conclusion can be avoided, under this evidence, that this provision for George J. Gould was made in payment of an existing debt owing by the decedent at the time of his death. It was clearly a debt which could have been enforced against the estate if its payment had been resisted. It was competent for the father and son in 1880 or 1881 to make the agreement for the performance of the services, although the son was then under age. The agreement was made and was acted upon, not only during the minority of the son, but for six or seven years after he came of age. No rate of compensation was originally agreed upon, but in 1892, before the decedent's death, such an agreement was clearly made, and both parties assented to it in the clearest terms. The father put it in writing and signed it, and stated that he did it to the end that it should be binding upon him if he should die before the provision was inserted in the codicil and the codicil was executed by him; and then he executed the codicil with the provision in it, and the son in express terms assented to the provision so made and accepted it as satisfactory to him. The provision then became binding upon both parties, and neither could thereafter avoid it. The representatives of the estate were bound by it as well as the decedent and the son. It will not do to say that the provision was too liberal and the services were not worth the amount agreed to be paid, in view of the prior gifts and gratuities to the son during the decedent's lifetime. The decedent had a right to give his son whatever he pleased before he died. And he had a right to pay or agree to pay his son for his services, concededly rendered, whatever he saw fit, even if the amount so agreed to be paid was liberal and in excess of what the son would have been likely to recover in the absence of such agreement.

We see no reason to doubt that the intention of the decedent was to make the provision purely as compensation for the services rendered, and that being so, the indebtedness was fully established, not only as against the estate of the decedent, but also for the purpose of the valuation of the property of the decedent for taxation under the statute.

The expenses of administration were, without doubt, a proper

item for deduction in this proceeding. (*Matter of Westurn, supra.*) The only question is whether the amount of such expenses could be arrived at by estimating the same in part, as was done in this instance. The evidence given before the appraiser was that $75,000 had already been expended, and that $75,000 more would be expended in the administration of the estate. It has for many years been the practice in the city of New York to arrive at the amount of expenses of the administration to be deducted in these proceedings in this manner, and we see no objection to it. There is no suggestion made that the estimate was too large.

Proper deduction was made as for commissions of the executors. Such commissions were a proper item of deduction. (*Matter of Westurn, supra.*) The decedent made a provision for the executors of $10,000 each per year in lieu of commissions. This amount was apparently less than the commissions prescribed by law would have been. This provision was accepted by the executors, and the estate, therefore, has only this provision to comply with so far as commissions are concerned. The present value of such annual provision was ascertained and deducted by the appraiser, and we think no further amount could properly have been allowed. It did not appear that the property would be reduced in value by the payment of any larger sum as for commissions, and only the actual expense to be incurred for that purpose could be allowed and deducted.

We think the proper rule was applied by the appraiser, and approved by the surrogate, in ascertaining the value of the securities of the decedent. It was sought to ascertain their fair value at the time of the death of the decedent, as required by sections 11 and 12, chapter 399, Laws of 1892. The appraiser stated in his report that he had, so far as they were submitted to him, reports of public sales of securities at the Stock Exchange, based his appraisal strictly upon such sales, and in other cases he had reached the value upon the best information he could obtain. This was the correct rule, and if properly applied, the result was unobjectionable. It was held by the Court of Appeals in 1887, in *People ex rel. K. F. Ins. Co.* v. *Coleman* (107 N. Y. 544) that the value of stock might be very properly determined by sales at the Stock Exchange. It was there said that "the market value of any stock which is listed at the Stock Exchange in New York, and largely dealt in from

day to day, for a series of months will usually furnish the best measure of value for all purposes. The competition of sellers and buyers, most of them careful and vigilant to take account of everything affecting value of stock in which they deal, and each mindful of his own interests and seeking for some personal gain and advantage, will almost universally, if time sufficient be taken, furnish the true measure of the actual value of stock." Later, and in 1891, the Legislature enacted chapter 34 of the laws of that year, which provided: "Sec. 1. Whenever, by reasons of the provision of any law of this State, it shall become necessary to appraise, in whole or in part, the estate of any deceased person, * * * the persons whose duty it shall be to make such appraisal * * * shall value all such property, stocks, bonds or securities as are *customarily* bought or sold in open markets in the city of New York, or elsewhere, for the day on which such appraisal or report may be required, by ascertaining the range of the market and the average of prices as thus found running, through a reasonable period of time." The rule laid down in this statute was applicable to this proceeding, and the appraiser evidently so designed to apply it. It is claimed, however, that the rule should be so construed that when the value of large blocks of stock is involved, only the purchase and sale in markets of correspondingly large blocks of stock should be considered upon the theory that such large blocks would necessarily sell at lower rates than small quantities of stock sold separately; and that throwing large blocks of stock upon the market all at once would have a tendency to produce a break in the market, and perhaps a total inability to get more than a mere nominal price offered for that stock. Whatever the rule may be as to the ascertainment of value in other cases than those covered by the statute of 1891, we think no such construction can be given to that statute as is contended for. The statute, properly applied, will prevent the injustice suggested by this attempted construction. Under the construction contended for, the securities involved in this proceeding might have been shown to be of little or no value by considering that forcing them upon the market in large blocks at one time would break the market and make them practically unsalable at all. The rule adopted by the appraiser was the correct rule, and he apparently applied it properly in determining

the value of the large amount of securities belonging to the decedent's estate.

We do not regard it as necessary to go into the details of the appraisal. We see no reason to disturb the conclusions arrived at by the appraiser and approved by the surrogate.

Our conclusion is that none of the objections taken to the order appealed from by either party are well taken. The order was properly made and should be affirmed, without costs of the appeal to either party.

VAN BRUNT, P. J., RUMSEY and PATTERSON, JJ., concurred.

INGRAHAM, J. (dissenting):

I am unable to agree in the affirmance of the decision of the surrogate that the provision of the will by which $5,000,000 in securities is directed to be delivered to George J. Gould is not a transfer by will within the provision of the statute.

The statute provides that "a tax shall be and is hereby imposed upon the transfer of any property, real or personal, of the value of five hundred dollars or over, or of any interest therein, or income therefrom, in trust or otherwise, to persons * * * when the transfer is by will * * * from any person dying seized or possessed of the property while a resident of the State." (Chap. 399, Laws of 1892, § 1.) By the 8th clause of the 2d codicil to the last will and testament of the testator a statement was made that George J. Gould had devoted himself entirely to the business of the testator, and that the testator fixed the value of such services at $5,000,000, payable a portion in cash and the balance in certain specified securities, to be treated as worth par. The said clause also contained the provision that "the receipt of the said George J. Gould in full for the said services and all other services down to the time of my death, not otherwise paid for by me during my lifetime, unless I shall hereafter by a different testamentary provision provide, shall be all the voucher required by my executors and trustees." This codicil was executed November 21, 1892. The testator died December 2, 1892. The evident intention of this codicil was that George J. Gould should receive from the testator's estate this amount of cash and the securities mentioned, and that such legacy should be considered as the compensation for the services rendered by George J. Gould to

his father during his lifetime. But it seems to me that, considering all of the circumstances, it was in the nature of a voluntary gratuity to his son, which it was intended should pass by will, rather than the payment of an obligation to his son for services rendered. I do not think that we are justified in treating this provision of the will as a payment of a debt due by the testator to his son. The testimony discloses that, during all this period for which George J. Gould had acted for his father, his father had paid to him large sums of money which had been used by him, besides making him a regular allowance of a considerable amount. There is no doubt but that there was some understanding between the father and son that the services that he rendered should be in some way recognized by the father, but that is very different from there being a distinct obligation to pay a specific sum, or an obligation to pay what the services were reasonably worth, which could be considered in settling the estate of the testator as a legal existing liability at the time of his death.

Take the case of a contract to make mutual wills between two persons, or a promise that a provision will be made by will as compensation for services to be rendered, there would, I think, be no doubt but that any provision made under such a contract would be taxable under the statute. And it seems to me quite clear from the testimony here that it was such an intention that the testator intended to express by the conversations which are detailed in the evidence. They are all expressive of an intimation on the part of the father to induce the son to refrain from speculation and to devote himself to protecting his father's interests rather than a contract or obligation to pay for services rendered. It is not claimed that the amount fixed by this codicil was based upon the value of the services rendered, or, that, considering the amount that George J. Gould received from his father during the period in which the services were rendered, this sum would have been the fair value of such services. The whole intention, as expressed, seems to me to point clearly to the idea that what the testator did was intended as a voluntary gratuity to the son in recognition of the devotion that the son had shown to his father. It was rather a bequest to the son, in addition to that given to his other children, as a recognition of the devotion that the son had shown to his father, than the distinct recognition and payment of an existing legal obligation. The duty

of making a proper provision for his children by a parent is recognized by all, and it is quite natural that, in making such provision by will, the devotion to the interest of the parent by a particular child should be recognized in the provision that is made; but this is never looked upon as a legal obligation, but rather the reason for a discrimination by the parent in the disposition of his estate. The instrument executed by the testator and delivered to the counsel who drew the will does not of itself change the legal effect to be given to this provision of the will. It was handed by the testator to his counsel as a memorandum to be used in the preparation of the codicil. The statement to his counsel, "that he had signed that paper to the end that if he should die it would be binding upon him, and asked me if it would not be, and I said yes, I did not see why it should not," is entirely consistent with the idea that it was evidently in the mind of the testator that a provision in the will, or in some legal instrument, which would justify his executors in delivering the securities and money named to his son was necessary to enable his son to receive what he intended for him. There is not one word in this memorandum, or in the codicil, as prepared, that recognizes an existing legal obligation to pay this sum of money to his son. On the contrary, it was evidently in the mind of the testator that but for this prepared writing, or the codicil which should afterwards be inserted in the will, the legal obligation did not exist. Both the instrument and codicil were testamentary, and intended only to become effectual upon the death of the testator, and the disposition of the property was subject to the tax.

I think, therefore, that on the appeal of the State, the order of the surrogate should be reversed and the case sent back to him with a direction to ascertain the value of this legacy to the son for the purpose of taxation.

The appeal of the executors should, I think, also be sustained. The estate consisted principally of stocks and bonds of various railroad corporations and debts due to the testator from such corporations. In making this appraisement the appraiser concluded that he was bound by section 1 of chapter 34 of the Laws of 1891 to take the quotations of the New York Stock Exchange and fix the market value by ascertaining the price at which such securities had been there sold. Conceding that a rule is provided by this statute

for the appraisal of the estate of the testator, it must be read in connection with the act which imposes the tax upon this property. By that statute the appraiser is directed to appraise the property at its fair market value, and it is to be fixed as of the death of the testator. It is the fair market value of the right of such succession that the appraiser is required to fix; and while under the act of 1891, before cited, he is to fix that value according to the range of the market and average prices at which such securities are bought and sold in open market in the city of New York, this rule, I think, applies only to cases where there is such a market for securities; and the mere fact that there have been isolated sales of a small amount of particular stocks or bonds would not justify an appraiser in disregarding all the evidence relating to the said sales, the amount of the stock and bonds sold in comparison with the amount of the property to be appraised or any other fact which would tend to show that the particular sale or sales quoted is not a fair criterion of the market value of the legacy, or the right to succeed to the personal property which passes under the will or the intestate law.

Now, the testimony in this case is quite conclusive and uncontradicted that many of these securities had no real market value in New York at anything like the quotations; while the opinion of a witness that an attempted sale at the Stock Exchange of such a mass of securities as that held by this estate would decrease the value so as to make a serious depreciation in the price should not, of itself, be sufficient to show that the price at which stocks were sold is not a fair criterion of their market value; and this would evidently apply to such stocks as Missouri Pacific, Metropolitan Railway and Western Union Telegraph.

There were, however, other securities as to which the evidence shows that the appraiser relied too exclusively upon a simple sale of a small amount of stock or the quoted prices at the Stock Exchange as fixing a fair market value. Take the securities that are known in the report as Missouri Pacific trust five per cent bonds. Of those the testator held upwards of $10,000,000 at par value, and the value fixed by the appraiser was eighty-nine per cent. George J. Gould testified that for those securities sixty cents on the dollar was much more than he could sell them for, and he also testified as to the Missouri Pacific first collateral bonds, of which the estate held

bonds to the par value of $2,333,000, that fifty cents on the dollar was much more than they could be sold for. These last the appraiser valued at seventy cents.

Now, the evidence of Mr. Keppler and Mr. Pierce was that there was absolutely no market value of these bonds; that it would have been impossible to sell $10,000,000 of the bonds at any price, and that what were called sales at the exchange were merely nominal quotations, and that there was actually no market for these securities.

It seems to me that the appraisement of these securities at the amount fixed by the appraiser was clearly excessive. So, in regard to the Iron Mountain five per cent consolidated bonds, the value was fixed by the appraiser at eighty-three, and yet it seems, from the testimony of Mr. Keppler, that the fair market price for these bonds at this time was not above seventy-five per cent.

As to the various unlisted securities, upon which there is no market value proved, it seems to me that the appraisement was entirely too high and much more than the evidence justified. This is especially true in regard to the debts due from the Missouri Pacific and Iron Mountain Companies. I think the record entirely fails to show that the value of seventy-five cents on the dollar placed upon the indebtedness of the Missouri Pacific Railroad Company and the St. Louis, Iron Mountain and Southern Railroad Companies was sustained by the evidence. This indebtedness was entirely unsecured, and while Mr. Gould stated in his examination that he considered the fair market value of the Missouri Pacific loan at the time seventy-five cents on the dollar, it is entirely evident that, from his subsequent testimony and the other testimony in the case, the market value of that loan at the time of the death of the testator was not over fifty cents on the dollar, and there is no evidence at all as to the value of the loan to the Iron Mountain Railroad Company being over fifty cents on the dollar.

I have merely indicated what seems to me to be the erroneous views adopted by the appraiser in fixing the value as he has of this estate. I have examined the testimony carefully with a view of indicating what in my opinion should be a correct appraisement, but in view of the fact that I think the case should go back to the appraiser for an appraisement of the value of the interest acquired by George J. Gould in the legacy to him of $5,000,000, it seems to

me that the best plan would be to send the whole case back to him for appraisement as to the value of this property at the time of the death of the testator, with a direction that where the sales upon the Stock Exchange are proved to be *bona fide* sales of securities which indicated at the time the fair market value of such securities, they are to control him in fixing their value. But in the case of those securities, where it is proved that there were no actual transactions, or that the reported transactions were of such a character that they furnished no fair indication of the market price, other evidence of the value should be considered, and the securities or indebtedness appraised at the fair market value, the value which, considering all of the circumstances, the property would have sold for at the time of the death of the testator.

As both parties have appealed, I think there should be no costs of this appeal.

Order affirmed, without costs to either party.